**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**


**SIDNEY EDWARD HUDDLESTON,**

    **Plaintiff,**

**v.**                                           **Case No.: 3:10-cv-01039**


**MICHAEL J. ASTRUE,**
**Commissioner of the Social**
**Security Administration,**

    **Defendant.**


**MEMORANDUM OPINION**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. This case is presently before the Court on the parties' cross motions for judgment on the pleadings as articulated in their briefs. (Docket Nos. 14 and 17).  Both parties have consented in writing to a decision by the United States Magistrate Judge. (Docket Nos. 15 and 16).

The Court has fully considered the evidence and the arguments of counsel. For the reasons that follow, the Court finds that the Commissioner's decision denying Claimant's application for DIB is supported by substantial evidence and, thus, should be affirmed.  However, the Court further finds that the decision of the Commissioner bearing on Claimant's application for SSI is not supported by

substantial evidence and should be remanded for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.  **Procedural History**

Sidney Edward Huddleston (hereinafter "Claimant"), filed applications for DIB and SSI on August 22, 1996, alleging that he had been disabled since June 1, 1995 due to arthritic pain, chest pain, and shortness of breath. (Tr. at 785, 801, 809). The Social Security Administration (hereinafter "SSA") denied the claims initially and upon reconsideration. (Tr. at 12). Thereafter, Claimant requested an administrative hearing, which was conducted on February 12, 1998 before the Honorable Andrew J. Chwalibog, Administrative Law Judge (hereinafter "ALJ"). (Tr. at 801-35). By decision dated February 8, 1999, the ALJ determined that Claimant was not disabled. (Tr. at 89-96). The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied Claimant's request for review. (Tr. at 102).

On May 24, 2002, Claimant filed a second round of applications for DIB and SSI, once again alleging a disability onset date of June 1, 1995. (*Id.*). After the SSA denied the applications initially and upon reconsideration, Claimant requested a hearing before an ALJ. The hearing was held on January 14, 2005 before the Honorable Steven D. Slahta. (Tr. at 836-60). By decision dated January 28, 2005, ALJ Slahta determined that Claimant was not disabled. (Tr. at 102-108). ALJ Slahta additionally found that the appropriate disability onset date was February 9, 1999, one day after the prior decision of ALJ Chwalibog, as his determination of no disability was *res judicata* for the time period between June 1, 1995 and February 8, 1999. Claimant requested a review of the hearing decision and on May 26, 2005, the

Appeals Council remanded the case to ALJ Slahta to address several omissions in the written decision.  (Tr. at 120-122).

On November 3, 2005, ALJ Slahta conducted a second administrative hearing and subsequently directed written questions to a vocational expert. (Tr. at 861-876). The ALJ issued his decision on December 16, 2005, again finding that Claimant was not disabled. (Tr. at 125-134). ALJ Slahta reiterated that the disability onset date was February 9, 1999 and confirmed that for purposes of DIB, the Claimant was insured through December 31, 1999. The ALJ indicated that in order to recover DIB, Claimant was required to establish that he was disabled prior to that date, but had not done so.  (Tr. at 128).

Claimant requested a review of the hearing decision and on November 2, 2007 the Appeals Council remanded the case a second time. (Tr. at 137-139). The Appeals Council highlighted several concerns with the ALJ's decision including, in relevant part, the need for additional evidence related to Claimant's right lower extremity problems and a rationale to support the assessed limitations of Claimant's maximum residual functional capacity ("RFC"). (Tr. at 138). Because the case had previously been remanded to ALJ Slahta, the Appeals Council requested that the matter be assigned to a new ALJ.  The case was assigned to the Honorable David B. Daugherty.

On March 10, 2008, ALJ Daugherty held a third administrative hearing on Claimant's 2002 applications.  (Tr. at 877-889). By decision dated March 31, 2008, ALJ Daugherty found that Claimant was not disabled. (Tr. at 143-149). He adopted the RFC assessment of ALJ Slahta and concluded:

> The undersigned, having had to [sic] opportunity to review the claimant's medical records and to hear and observe the claimant's hearing testimony found no new evidence of disability prior to his date last insured December 1999, and no new evidence since the last decision. Accordingly, his right lower extremity problems cannot be further evaluated with no new evidence as well as his mental impairment and alcoholism.

(Tr. at 146). Claimant requested review of the hearing decision and on December 23, 2008, the Appeals Council remanded the case for the third time. (Tr. at 152-154). The Appeals Council noted that the opinion was ambiguous as to the time frame considered by the ALJ; particularly, as the testimony at the administrative hearing was restricted to Claimant's condition between 1995 and 1999. The Appeals Council pointed out that while that time period was especially relevant for the DIB determination, the SSI determination required consideration of Claimant's alleged disability through the date of the decision. (Tr. at 153). In addition, the Appeals Council re-emphasized the need to obtain an adequate evaluation of Claimant's right lower leg impairment and to provide a sufficient explanation for the ALJ's RFC assessment, which conspicuously lacked any appraisal of Claimant's capacity for sitting, standing, and walking. The Appeals Council instructed the ALJ to complete seven tasks on remand, including, *inter alia,* to "[o]btain a consultative general medical examination concerning the claimant's right lower extremity problems and a medical source statement as to what the claimant can still do despite the impairments" and to "[g]ive further consideration to the Claimant's maximum residual functional capacity and provide appropriate rationale with specific references to evidence of record in support of the assessed limitations." (*Id.*).

On September 8, 2009, ALJ Daugherty conducted a fourth administrative hearing on Claimant's 2002 applications. (Tr. at 892-901). Claimant was

represented by counsel and testimony was taken from Claimant and a vocational expert. On October 16, 2009, the ALJ issued his written decision. (Tr. at 22-29). He indicated in the decision that he looked at the period prior to December 31, 1999 to determine Claimant's right to DIB. He further noted that Claimant had amended his disability onset date for purposes of his SSI claim to April 1, 2008; therefore, the ALJ also examined the period from April 1, 2008 through the date of his decision to determine Claimant's right to SSI.[1] (Tr. at 28-29). The ALJ concluded that "[h]aving twice had the opportunity to review claimant's medical records and to hear and observe his testimony, I am convinced that the claimant has remained capable throughout the period at issue of performing and sustaining a range of work activity within the parameters defined above." (Tr. at 28). Hence, the ALJ found Claimant was not disabled. The decision of the ALJ became the final decision of the Commissioner on June 22, 2010 when the Appeals Council refused Claimant's request for review. (Tr. at 13-15). Claimant timely filed the present civil action seeking judicial review of the administrative decision pursuant to 42 U.S.C. §405(g). (Docket No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings, and both parties filed their Briefs in Support of Judgment on the Pleadings. Consequently, this matter is ripe for resolution.

## II.   <u>Summary of ALJ's Decision</u>

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial

---

[1] The Court is unable to find corroboration of the amended disability onset date in the record. However, Claimant does not challenge this finding and, thus, apparently concedes its accuracy.

gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. 423(d)(1)(A).

The Social Security Regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520, 416.920. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If the impairment does, then the claimant is found disabled and awarded benefits.

However, if the impairment does not, the adjudicator must determine the claimant's RFC, which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the next step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to prove, as the final step in the process, that the claimant is able to perform other forms of substantial

gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. *Id.* §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d. 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined as a preliminary matter that Claimant met the insured status requirements of the Social Security Act through December 31, 1999.  (Tr. at 24, Finding No. 1).  At the first step of the sequential evaluation, the ALJ found that Claimant had not engaged in substantial gainful activity since June 29, 1995, the alleged disability onset date. (Tr. at 24, Finding No. 2).  Turning to the second step of the evaluation, the ALJ determined that Claimant had the severe impairment of degenerative joint disease ("DJD") of the right knee. (Tr. at 24-25, Finding No. 3). The ALJ explained that the previous adjudicator had found additional severe impairments, including history of hypertension (controlled with medication); mild restrictive lung disease with a history of concurrent tobacco abuse; history of coronary artery disease; and history of alcohol abuse. However, those conditions were now less than severe because Claimant's hypertension and coronary artery disease were stable and controlled on medication; his drinking had decreased significantly; and he continued to smoke against medical advice. (*Id.*). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of

the impairments contained in the Listing. (Tr. at 25, Finding No. 4). Thus, the ALJ assessed Claimant's residual functional capacity, finding:

> [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except stand/walk six hours total in an eight-hour workday; sit six hours total in an eight-hour workday unlimited pushing/pulling; never climb ladders/ropes/scaffold; no visual limitations; no communication problems; and would need to avoid concentrated exposure to extreme cold and hazards (dangerous moving machinery, unprotected heights, etc.)

(Tr. at 25-27, Finding No. 5).

The ALJ found that Claimant could not return to his past relevant employment as a sandblaster, defined as medium to heavy, skilled work. (Tr. at 27, Finding No. 6). The ALJ considered that (1) Claimant was 47 years old on the alleged disability onset date, defined as a younger individual aged 18-49 years old, and "subsequently changed age category to closely approaching advanced age;" (2) he had a high school education and could communicate in English; and (3) transferrability of job skills was immaterial because the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2 (the "grids") supported a finding of "not disabled." (Tr. at 27, Finding Nos. 7, 8 and 9). Using the grids as a framework, and considering Claimant's age, education, work experience, RFC, and the testimony of a vocational expert, the ALJ concluded that jobs existed in significant numbers in the national economy that Claimant could perform. (Tr. at 27-28, Finding No. 10). Consequently, Claimant had not been under a disability, as defined in the Social Security Act, from April 1, 2008 through the date of the decision.  (Tr. at 28-29, Finding No. 11).

### III.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock v. Richardson*, 483 F.2d 773, 776 (4th Cir. 1972) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court is not charged with conducting a *de novo* review of the evidence.  Instead, the Court's function is to scrutinize the totality of the record and determine whether substantial evidence exists to support the conclusion of the Commissioner. *Hays v. Sullivan,* 907 F.2d 1453, 1456 (4th Cir. 1990).  The decision for the Court to make is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart,* 434 F. 3d 650,653 (4th Cir. 2005), citing *Craig v. Chater,* 76 F.3d 585, 589 (4th Cir. 2001).  If substantial evidence exists, then the Court must affirm the decision of the Commissioner "even should the court disagree with such decision." *Blalock v. Richardson, supra* at 775.

### IV.   **Claimant's Background**

Claimant was born in January 1948 and was fifty-one years old at the time of the disability onset date of February 9, 1999.  (Tr. at 892, 899). On April 1, 2008, Claimant's amended disability onset date for purposes of SSI, he was sixty years old. Claimant completed the eleventh grade in school and subsequently obtained a GED.

(Tr. 806). His prior job experience included work in the construction industry as a painter and sandblaster. (Tr. 893). Claimant's primary language was English.

## V.   <u>Claimant's Challenges to the Commissioner's Decision</u>

Claimant's sole challenge to the decision of the Commissioner is that the ALJ failed to follow the remand instructions of the Appeals Council. (Docket No. 14 at 9-10).  Specifically, the Appeals Council ordered the ALJ to:

> [o]btain a consultative general medical examination concerning claimant's right lower extremity problems and a medical source statement as to what the claimant can still do despite the impairments.

According to Claimant, the ALJ ignored this directive and, instead, reconstructed the order to require him only to "consider the medical source statements as to what the claimant can still do despite his impairments in regards to his lower extremity problem." (*Id.*). As a result, the ALJ neither obtained the requisite examination nor explained why one was not obtained. The Social Security regulations state that the ALJ "**shall** take any action that is ordered by the Appeals Council." Claimant stresses that the term "shall," when used in statutes and similar instruments, is "imperative and mandatory." (*Id.* at 8). Hence, the failure of the ALJ to obtain the examination and medical source statement necessitates remand.

In response, the Commissioner argues that the failure of the ALJ to obtain a consultative examination and medical source statement is a harmless procedural error that does not justify remand because the ultimate decision of the Commissioner is supported by substantial evidence.  (Docket No. 17 at 8-12).  The Commissioner further contends that Claimant has failed to meet his burden under *Shinseki v. Sanders,* 129 S.Ct. 1696, 1708 (2009) to demonstrate how the alleged error made a difference in the outcome of the case. The Commissioner posits that

Claimant is not entitled to a remand unless he can show that a consultative examination and medical source statement would have changed the ALJ's decision. (*Id.*).

## VI.   **Relevant Medical Evidence**

### A.   **Alleged Period of Disability for DIB—February 9, 1999 through December 31, 1999**

On March 11, 1999, Claimant began treatment at the Veteran's Administration Medical Center in Huntington, West Virginia ("VAMC"). On that date, Claimant presented to the Emergency Department complaining of flu-like symptoms. (Tr. at 445). He reported a past medical history of heart disease and hypertension. Claimant was evaluated and diagnosed with an upper respiratory infection and bronchitis. (Tr. at 446). He was prescribed antibiotics and told to use Robitussin and follow a low sodium diet.

On May 26, 1999, Claimant initiated primary care through the VAMC. (Tr. at 437). By way of history, he advised the intake nurse that he had suffered a myocardial infarction approximately four years earlier. He had a heart catheterization at that time, which revealed a partial blockage of his coronary artery. Claimant complained that he sporadically experienced exertional chest pain. Claimant also gave a history of peptic ulcer disease, for which he had taken Zantac. (*Id.*). Despite these conditions, Claimant admitted to smoking heavily. He denied having any functional impairment or limitation with ambulation and agreed that he had sufficient energy to complete his activities of daily living. (Tr. at 440). He also denied any psychological symptoms or any acute medical problems. (Tr. at 440-41). The examining physician scheduled Claimant for a routine cardiology consultation

and a stress test.  (Tr. at 439).  The test was completed on July 1, 1999 and revealed an ejection fraction of 50% and mild to moderate ischemia. (Tr. at 413). At his cardiology consultation on July 13, 1999, Claimant was diagnosed with stable angina.  He was instructed to quit smoking and to return to the cardiologist in one year.  (Tr. at 434).

On August 30, 1999, Claimant presented to the primary care clinic at the VAMC for routine follow-up. (Tr. at 433). The treating physician reviewed the results of Claimant's stress test, as well as other screening tests that had been ordered. Claimant was diagnosed with stable angina and sinusitis. He received prescriptions for Augmentin and Zyrtec to treat the sinusitis and allergies and was told to stop smoking, to take a daily aspirin, and to return in five months.  (*Id.*).

### B.    Records Related to Right Lower Extremity—SSI Claim

The first record in evidence related to Claimant's right lower extremity is dated March 20, 1995 and memorializes Claimant's visit with a physician at Healthcare of Gallipolis Ferry. (Tr. at 692). Claimant reported right knee pain and a sensation that his knee joint was "popping out."  He denied any swelling on that day, but stated that his knee did swell at times. On examination, the treating physician found no swelling, warmth, redness, or crepitus. He diagnosed probable meniscus/ligamentous[2] damage and recommended an orthopedic consultation. (*Id.*).

Claimant was seen by Dr. David Surdyra, an orthopedist, on April 12, 1995. (Tr. at 779).  Claimant told Dr. Surdyra that his right knee had been bothering him

---

[2] The meniscus is a rubbery, C-shaped disc that cushions the knee and helps balance weight on the joint, keeping the knee steady. *See* WebMD at www.WebMD.com.

for about three years, but the pain had increased over the prior month, especially with prolonged standing. He complained of some instability primarily when walking on uneven surfaces, but denied frank locking of the knee. Claimant indicated that he was otherwise healthy. On physical examination, Dr. Surdyra found a normal range of motion in the knee with some medial collateral ligament laxity and numerous varicose veins at Claimant's medial calf and thigh. (*Id.*). Claimant was neurologically intact. X-rays revealed mild symmetrical joint space narrowing with subchondral sclerosis and a lateral femoral condyle defect. There also appeared to be a loose bone fragment buried in the region of the posterior cruciate ligament and an old PCL avulsion facture at the PCL insertion site on the tibia. Dr. Surdyra diagnosed prior probable remote knee dislocation with residual ACL/MCL deficiency/instability;[3] early degenerative joint disease ("DJD") in the right knee;[4] and a probable meniscal tear. He recommended an arthroscopic examination under anesthesia with a meniscal debridement. If that procedure did not correct the instability, Claimant could consider a reconstructive procedure. (*Id.*).

On April 25, 1995, Dr. Surdyra performed an arthroscopy of Claimant's right knee with a partial meniscectomy[5] of the medial and lateral meniscus, debridement

---

[3] The anterior cruciate ligament (ACL) is one of the two major ligaments in the knee, connecting the thigh bone to the shin bone.  The medical collateral ligament (MCL) also connects the thigh bone to the shin bone. *See* WebMD at www.WebMD.com.

[4] Also called osteoarthritis, degenerative joint disease is a chronic breakdown in the cartilage of the joints.  DJD cannot be cured and most likely will worsen over time.  DJD affects each sufferer differently.  Pain and stiffness may prevent some people from performing simple daily activities while others are able to maintain active lifestyles. *See* A.D.A.M. Medical Encyclopedia, National Library of Medicine, PubMed Health at  www.ncbi.nlm.nih.gov.

[5] Meniscectomy is the surgical removal of all or some of a torn meniscus. *See* WebMD at www.WebMD.com.

of the anterior cruciate ligament stump, and a partial synovectomy[6] and loose body removal.  (Tr. at 622).  The surgery proceeded without complication. At a follow-up visit nine days later, Dr. Surdyra documented that Claimant had no complaints and his range of motion was good. Claimant was instructed to continue with physical therapy and return to the office in four weeks for re-evaluation. (Tr. at 778). Claimant did not return until April 30, 1997, two years later. (Tr. at 777). At that visit, he reported having good relief in his knee for the last year, although he had recently developed some symptoms. (*Id.*). An x-ray taken of Claimant's right knee on April 24, 1997 showed moderately advanced degenerative arthritis; a large cyst in the lateral tibial plateau; and possible loose bodies in the posterior aspect of the lateral joint compartment. (Tr. at 771). Despite these changes, Claimant did not receive treatment for his knee at that time.

Claimant next received treatment for his right knee at the Pleasant Valley Hospital Emergency Department after injuring it in a motor vehicle accident on May 17, 2000. (Tr. at 341-343). Claimant was a passenger in a truck that hit a tree. The impact caused rib fractures and lacerations to his face, chest, and right knee. An x-ray of his knee revealed degenerative changes, but no acute fractures. (Tr. at 344). His lacerations were sutured.

On August 3, 2001, Claimant presented to the VAMC for regular primary care. (Tr. at 410). He complained of chronic knee pain, but denied any new functional impairment/limitation with his limbs or with ambulation. (*Id.*). Claimant again complained of knee pain at the VAMC on August 26, 2002, which he

---

[6] Synovectomy is the surgical removal of inflamed joint tissue, which is causing unacceptable pain, limiting the ability to function, and reducing range of motion. *See* WebMD at www.WebMD.com.

described as "aching" and "continuous," and was given a prescription of Etodolac, a non-steroidal anti-inflammatory medication used to relieve swelling, tenderness, pain, and stiffness caused by arthritis.  (Tr. at 398-99).

On September 17, 2002, Claimant underwent a disability determination evaluation performed by Dr. Rodolfo Gobunsuy at the request of the West Virginia Disability Determination Service ("DDS"). (Tr. at 349-355). Claimant advised Dr. Gobunsuy that his chief complaints were chest pain, shortness of breath, and joint pain.  In regard to his knee, he stated that his pain increased with strenuous exercise and on cold or rainy days. On physical examination, Dr. Gobunsuy observed that Claimant walked steadily without ambulatory aids, but did have a mild antalgia[7] favoring his right leg. His peripheral pulses were normal and there was no evidence of vascular insufficiency, varicose veins, stasis ulcers, muscle weakness or atrophy. Claimant could walk on his heels and toes and heel-to-toe tandem, but was unable to squat.  (*Id.*).  His right knee showed synovial thickening and crepitation and had a slightly decreased flexion-extension at 130 degrees. Dr. Gobunsuy's impressions included arthritic changes of the right knee without atrophy.  (Tr. at 353).

Based upon Claimant's medical records, as well as Dr. Gobunsuy's examination, Dr. Thomas Lauderman completed a RFC assessment on October 3, 2002. (Tr. at 362-369). He determined that Claimant could lift and carry 50 pounds occasionally and 25 pounds frequently; that he could stand, walk, and/or sit six hours, each, out of an eight hour workday; and that he had an unlimited ability to push and pull. Dr. Lauderman noted Claimant's inability to squat, but found no

---

[7] An antalgic gait is a limp adopted to avoid pain on weight-bearing structures. *Dorland's Medical Dictionary for Consumers,* 2007.

postural, manipulative, visual, communicative, or environmental limitations.  (*Id.*).

Dr. Lauderman's conclusions were largely confirmed by Dr. Fulvio Franyutti, who

completed a second RFC assessment on March 31, 2003. (Tr. at 447-454). His

assessment mirrored that of Dr. Lauderman except Dr. Franyutti opined that

Claimant should avoid concentrated exposure to extreme cold.

Claimant next complained of joint pain on January 27, 2003. (Tr. at 371-72).

He advised Dr. Mehdi Chowdhury, his primary care physician at the VAMC, that all

of his joints hurt and his head was congested. Claimant was given a prescription of

Percogesic, a combination of acetaminophen and antihistamine prescribed for both

musculoskeletal and flu-related pain. Claimant reiterated his complaint of joint pain

at a follow-up visit on June 6, 2003. (Tr. at 378-383). Dr. Chowdhury decided to

change  Claimant's  prescription  to  Salsalate,  another  non-steroidal  anti-

inflammatory medication.  (Tr. at 383).

In June 2003, Claimant was incarcerated and shortly thereafter began to

receive chronic care treatment at Huttonsville Correctional Center; primarily, for

hypertension and cardiac symptoms. (Tr. at 474). On January 20, 2005, Claimant

complained of leg pain and numbness which he felt were related to varicose veins.

(Tr. at 469). He was examined on February 2, 2005 and found to have distended

veins, but no evidence of thrombosis or unusual discoloration. His pedal pulses,

capillary refill, and range of motion were normal. (*Id.*). He was prescribed thigh

high support hose for the varicose veins and Disalcid (Salsalate) for pain. He

continued to receive Disalcid until his discharge from the facility.

On May 12, 2006, Claimant returned to the VAMC to resume primary care.

(Tr. at 549-554). He complained of chronic pain and swelling bilaterally in his knees

and elbows. He described his knee pain as an intermittent aching with an intensity of 7 out of 10 on the standard pain scale. He did not describe any new functional limitation or impairment related to his limbs or ambulation. Dr. Chowdhury prescribed Etodolac for the pain and inflammation. (Tr. at 549). On November 1, 2006, during a visit with Dr. Chowdhury, Claimant reported that the Etodolac had caused him to suffer an allergic reaction. Accordingly, Claimant had started self-medicating with Lortab, which he obtained from his brother and son who had prescriptions for the medication. (Tr. at 541). Dr. Chowdhury prescribed Darvocet instead of Etodolac.  (Tr. at 543).

Claimant returned to the VAMC on December 20, 2006 complaining of swelling and tenderness in his right lower leg. (Tr. at 536). On examination, Dr. Chowdhury noted varicose veins in the right lower leg, which were tortuous with more prominent swelling in the popliteal fossa.[8] He recommended consultation with a vascular surgeon. On January 25, 2007, Claimant was seen by Dr. John Walker, who also noted varicose veins, primarily in Claimant's right leg, with swelling. (Tr. at 535). Dr. Walker ordered a duplex ultrasound to rule out deeper thrombosis and discussed surgical removal of the superficial vein. The ultrasound showed no evidence of deep vein thrombosis, (Tr. at 512), and Claimant decided to wait on surgery.  (Tr. at 535).

On June 18, 2007, Claimant underwent a whole body bone scan.  (Tr. at 510). The scan showed increased uptake at the right knee joint medially, laterally, and at the patellofemoral compartment, most compatible with degenerative changes.  No modifications were made to Claimant's treatment regimen at that time.

---

[8] The depression in the posterior of the knee.  *Dorland's Medical Dictionary for Consumers,* 2007.

The final medical record in evidence is a progress note from the VAMC detailing a routine follow-up visit by Claimant on December 20, 2007. (Tr. at 521-526). At this visit, Claimant complained primarily of cough and cold symptoms and upper back pain. On examination, he was noted to have varicose veins in his right lower leg. Dr. Chowdhury prescribed Hydrocodone, a narcotic analgesic, for Claimant's complaints of upper back pain and DJD.

## VII. <u>Analysis</u>

### A. **Failure to Follow Remand Order**

In its October 16, 2009 remand order, the Appeals Council directed the ALJ to complete seven specific tasks. Claimant complains about the ALJ's failure to finish one of them; that being, to obtain a consultative examination concerning Claimant's right lower extremity impairment and a medical source statement on Claimant's functional abilities despite that impairment.

A threshold question is whether, as Claimant posits, the failure of an ALJ to follow a remand order issued by the Appeal's Council provides an independent basis for reversal and remand. At least some courts have concluded that Section 405(g) does not provide the district courts with jurisdiction to act on an ALJ's noncompliance with the Appeals Council's remand order because such an order is merely an intermediate agency action and not the final decision of the Commissioner. *See, e.g. Brown v. Commissioner of Social Security,* 2009 WL 465708 at *5 (W.D. Mich. Feb. 24, 2009) ("Whether an ALJ complies with an Appeals Council order of remand is an internal agency matter which arises prior to the issuance of the agency's final decision ... Section 405(g) does not provide this court with authority to review an intermediate agency decision that occurs during

the administrative review process."); *Bass v. Astrue,* 2008 WL 3413299 at *4 (M.D.N.C. Aug. 8, 2008) ("The Court does not review internal, agency-level proceedings, and therefore, will not address whether the ALJ complied with specific provisions of the Appeals Council's remand order."); *Peckham v. Astrue,* 780 F. Supp.2d. 1195, 1203 (D. Kan. 2011) (Jurisdiction of the court is "limited to judicial review of the final decision of the Commissioner."). Other courts have taken the position that the failure of an ALJ to comply with an order of the Appeals Council "constitutes legal error and necessitates remand." *Scott v. Barnhart,* 592 F.Supp.2d 360, 371-72 (W.D.N.Y. 2009); *Mortise v. Astrue,* 713 F. Supp.2d 111, 123 (N.D.N.Y. 2010) (same); *Salvati v. Astrue,* 2010 WL 546490 at *7 (E.D. Tenn. Feb. 10, 2010) ("To recognize substantial evidence as a defense to non-compliance ... would afford the Commissioner the ability to violate the regulation with impunity and render the protections promised therein illusory," citing *Wilson v. Comm'r of Soc. Sec.* 378 F.3d 541, 546 (6th Cir. 2004)). Still others have concluded that the issue of whether an ALJ complied with a remand order evaporates when the Appeals Council adopts the ALJ's decision as the Commissioner's final decision; with that action, the Appeals Council implicitly acknowledges that the ALJ's decision is compliant with the order. *Walker v. Astrue,* 2009 WL 3160165 at *15 (E.D.La. Sep. 29, 2009).

The Social Security regulations provide that the "administrative law judge shall take any action that is ordered by the Appeals Council." 20 C.F.R. § 404.977(b). The Supreme Court of the United States has recognized as a fundamental principle of administrative law that agencies are obligated to follow their own regulations. *American Farm Lines v. Black Ball Freight Service, et al.,* 397 U.S. 532 (1970). Nevertheless, courts have applied a harmless error analysis to

administrative decisions that do not fully comport with the procedural requirements of the agency's regulations, but for which remand "would be merely a waste of time and money." *Jenkins v. Astrue,* 2009 WL 1010870 at *4 (D. Kan. Apr. 14, 2009), citing *Kerner v. Celebrezze,* 340 F.2d 736, 740 (2nd Cir. 1965). In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir. 1983). This circuit has also employed the harmless error analysis in the context of Social Security disability determinations. *See Morgan v. Barnhart,* 142 Fed. Appx. 716, 722-23 (4th Cir. 2005)(unpublished); *Bishop v. Barnhart,* 78 Fed. Appx. 265, 268 (4th Cir. 2003)(unpublished). Accordingly, the undersigned finds that an ALJ's failure to follow the directives of remand order issued by the Appeals Council constitutes legal error, but declines to accept Claimant's position that this error automatically requires reversal and remand.  Instead, the Court finds that the failure of an ALJ to follow the directives of the Appeals Council necessitates remand only when that error results in harm to the claimant. Contrary to the Commissioner's position, however, to prove harm in this case, Claimant is not required to establish that the consultative examination and medical source statement would have changed the ALJ's decision; rather, Claimant must only demonstrate that the Commissioner's decision "might reasonably have been different had that evidence been before [the ALJ] when [his] decision was rendered." *King v. Califano,* 599 F.2d 597, 599 (4th Cir. 1979). Claimant may also demonstrate prejudice by showing that the absence of the examination and medical source statement resulted in a final decision that lacked

substantial evidentiary support. *See Balde v. Astrue,* 2011 WL 3419371 at *17 (E.D. Wis. Aug. 4, 2011) ("whether the ALJ complied with the Appeals Council's remand order is not, in the final analysis, of independent importance. The only question properly before [the court] is whether the ALJ's decision (which the Appeals Council chose to leave undisturbed) is supported by substantial evidence," *citing to Poyck v. Astrue,* 414 Fed. Appx. 859, 861 (7th Cir. 2011)); *See also Yonek v. Astrue,* 2011 WL 1231154 (D. Md. Mar. 28, 2011) (the failure of an ALJ to follow a remand order from the Appeals Council does not automatically warrant a remand); *Quimby v. Comm'r of Soc. Sec.,* 2010 WL 2425904 (D.Vt. Apr. 13, 2010) (An ALJ commits reversible error by ignoring an Appeals Council's mandate only when the error is harmful, "i.e. only to the extent that substantial evidence does not support the ALJ's ultimate conclusions.").

## B.    Claimant's DIB Application

The Commissioner argues that a consultative examination performed in 2009 would be particularly irrelevant to Claimant's DIB application because "[t]here is no reasonable likelihood that an examination of Plaintiff conducted in 2009 could establish that Plaintiff was disabled ten years earlier in 1999, especially in this case where there is significant contemporaneous evidence describing Plaintiff's condition during that relevant period."  (Docket 17 at 11).  Similarly, a medical source statement concerning Claimant's current functional limitations and capabilities would not be probative of his RFC in 1999.  The Court agrees.  The records in evidence provide a sufficient basis upon which to assess the severity, intensity, and persistence of Claimant's impairments and the resulting functional limitations that existed between February 9, 1999 and December 31, 1999, the date

on which Claimant was last insured. Indeed, one problem identified by the Appeals Council in its remand orders was the ALJ's emphasis on Claimant's physical condition and activities in and before 1999, almost to the exclusion of the post-1999 evidence.

A decision finding that Claimant was not disabled was made on February 8, 1999 and was *res judicata* for the period ending on that date. In that decision, the ALJ concluded that Claimant's medical impairments of post myocardial infarction and mild coronary artery disease were severe and his shortness of breath, left shoulder pain, and right knee impairment were not severe. (Tr. at 90-92). Claimant's impairments did not, separately or in combination, meet or medically equal a listed impairment, and he retained the RFC to perform medium level exertional work. (Tr. at 92-95). Taking into account Claimant's age, prior work experience, education, and RFC, the ALJ determined that Claimant was capable of performing a range of jobs that existed in the national economy in significant numbers.

The evidence relating to Claimant's impairments and functional limitations after February 8, 1999 and through December 31, 1999 does not support the conclusion that Claimant experienced any appreciable change in the severity, intensity or persistence of his medical impairments or the extent to which they limited his ability to engage in basic work activities. To the contrary, the evidence suggests that Claimant's impairments had remained stable or had slightly improved since the ALJ's earlier decision.

In May 1999, Claimant denied having any functional impairment or limitation with ambulation and conceded that he had sufficient energy to complete

his activities of daily living. (Tr. at 440). He denied any psychological symptoms or any acute medical problems. (Tr. at 440-41). Claimant's last visit with a physician in 1999 was in August. The medical records indicate that Claimant had no new complaints. His angina was stable and his hypertension was being controlled with medication. (Tr. at 433-441). His final treatment record reflects that he was receiving only routine medical care for chronic conditions. He was instructed to return in five months and apparently required no further treatment that year. Although Claimant had undergone surgery on his right knee in 1995, he experienced a good result with no symptoms for well over a year. While he had started to develop some problems with his knee in 1997, he did not receive any treatment until May 2000 after he had sustained new injuries secondary to a motor vehicle accident. (Tr. at 341-43). Claimant did not require ambulatory aids, physical therapy, surgery, or any medical intervention other than medications. In addition, subsequent medical records documented that Claimant was in "good health." (Tr. at 347). For these reasons, the Court finds that substantial evidence supports the Commissioner's decision that Claimant was not under a disability as of December 31, 1999.

### C.    Claimant's SSI Application

In contrast, the ALJ's failure to obtain an updated consultative examination and medical source statement regarding Claimant's functional limitations can hardly be considered harmless error in the context of Claimant's application for SSI. Claimant's disability onset date was amended to April 1, 2008. The ALJ's decision was generated on October 16, 2009. However, the evidence of record is devoid of any documents prepared between those dates; thus, not a single record reflecting

an examination or assessment of Claimant conducted after December 20, 2007 was available to the ALJ at the time of his decision-making. Moreover, the sole consultative examination performed on Claimant during the eight years that his SSI application was pending was completed on September 17, 2002, nearly six years **before** the alleged date of disability and seven years **before** the administrative hearing. Similarly, the only RFC assessments in the record were completed in October 1996, February 1997, October 2002, and March 2003.

ALJ Daugherty found that Claimant had the severe impairment of DJD. By definition, *degenerative* joint disease is a progressive deterioration of the joints. As such, it is probable that Claimant suffered some additional breakdown of the cartilage surrounding his knee joint between the examination in 2002 and the decision in 2009. Without an updated examination and medical source statement on the effects of that additional deterioration, the ALJ was hard-pressed to make a reasoned finding of non-disability. The Appeals Council obviously recognized this gap in the medical evidence, prompting it to remand the case with specific instructions for completion of a consultative physical examination focused on Claimant's right lower extremity conditions and a medical source statement detailing what Claimant was still able to do despite those conditions.[9] (Tr. at 63). In its remand order, the Appeals Council explicitly observed that the recent records from the VAMC showed continuing complaints of pain in the lower

---

[9] This was the second time the Appeals Council acknowledged an evidentiary gap related to Claimant's lower extremity impairment. In its remand order one year earlier, the Appeals Council instructed the ALJ to "[o]btain additional evidence concerning the claimant's right lower extremity in order to complete the administrative record in accordance with regulatory standards regarding consultative examinations and existing medical evidence." (Tr. at 138). The only medical evidence submitted after this November 2, 2007 remand order was the VAMC follow-up records, which the Appeals Council expressly found insufficient to form the basis of an accurate RFC assessment.

extremities with diagnoses of DJD and varicose veins, yet the clinical findings were "not sufficient to accurately determine the extent of the claimant's functional limitations." (Tr. at 61). Despite the Appeal's Council stance on the inadequacy of the existing records, the ALJ relied solely on those records to make a definitive determination of Claimant's functional limitations. His rationale for finding that Claimant had essentially the same RFC in 2009 as he had in 2005 was based less on the records that were in evidence than on the absence of records to the contrary. The ALJ explained in his written decision:

> As for the opinion evidence, I have considered the weight of the evidence and find that no medical professional has set forth an opinion or residual functional capacity assessment; and the state agency consultative examiner's [sic] have limited him to medium level work, as well as the prior Administrative Law Judge's assessment. There are no professional opinions in the medical evidence of record indicating that he could not perform medium level work. Accordingly, I agree and find that he is limited to medium level exertion.
>
> In sum, the above residual functional capacity assessment is supported by the weight of the evidence. The more recent medical records from the VAMC, although showing he continues to complain of pain in the lower extremities and contains the diagnosis of degenerative joint disease and varicose veins, the clinical findings are not sufficient to determine that he has an impairment which makes him disabled from performing substantial gainful activity.

(Tr. at 27). The ALJ simply ignores the fact that the Appeals Council ordered an examination and medical source statement precisely because the clinical findings in the VAMC records were inadequate to make a disability determination.

Although a claimant has the ultimate responsibility to prove disability, *Bowen v. Yuckert,* 482 U.S. 137, 146, n. 5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), an ALJ has a concurrent duty to ensure that the record is adequately developed to provide a sound basis for the disability determination and to "facilitate judicial

review." *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986); *See also* 20 C.F.R. § 416.912. "This circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on the evidence submitted by the claimant when that evidence is inadequate." *Cook,* 783 F.2d 1173, *citing Walker v. Harris,* 642 F.2d 712, 714 (4th Cir. 1981); *Marsh v. Harris,* 632 F.2d 296, 300 (4th Cir. 1980). When the record "reveals evidentiary gaps which result in unfairness or 'clear prejudice,'" remand is necessary. *Brown v. Shalala,* 44 F.3d 931, 935 (11th Cir. 1995), *quoting Ware v. Schweiker,* 651 F.2d 408, 413 (5th Cir. 1981). "Prejudice can be established by showing that additional evidence would have been produced if the ALJ had fully developed the record, and that the additional evidence might have led to a different decision." *Ripley v. Chater,* 67 F.3d 552, 557 n.22 (5th Cir. 1995).

Here, the ALJ conducted an administrative hearing on September 8, 2009 and issued an opinion on October 16, 2009 in which he expressly found that Claimant had not been under a disability from April 1, 2008 through the date of the decision. (Tr. at 22-29). However, the ALJ had no medical records, consultative examinations, or medical source statements pertinent to that time frame upon which to base his decision. Moreover, the ALJ made no inquiry into the existence of relevant supplemental records. It appears that medical records were diligently collected up to the point in the proceedings when that the case was remanded and reassigned to ALJ Daugherty. Medical records were in evidence documenting Claimant's conditions and treatment for every year beginning in 1995 and extending through December 2007, with the exception of one year-1998; this evidence even included records prepared while Claimant was in prison. Inexplicably, no

subsequent records were collected, although they most likely existed.  The available records reflect that Claimant had several chronic conditions that required regular monitoring, as well as progressive osteoarthritis. Consequently, it stood to reason that Claimant received medical treatment after December 2007 and records were available chronicling that care. Claimant confirmed at the last administrative hearing that he received all of his treatment at the VAMC, yet the ALJ never requested supplemental records from the VAMC or questioned Claimant about the nature and frequency of his medical care in 2008 and 2009. (Tr. at 898).  The ALJ made an assumption in his written decision that Claimant had not been referred to a specialist, had no recent x-rays of his right lower extremity, and had not lately been in physical therapy; however, the Court cannot deduce the source of these pronouncements. No records exist and no testimony was taken relative to these issues. It is unclear as to why Claimant's counsel did not supplement the record; however, regardless of whom is to blame, the end result is a conspicuous gap in the evidence. "Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 110-11, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000), *citing Richardson v. Perales,* 402 U.S. 389, 400-01, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). When circumstances point to the probable existence of probative and necessary evidence, which has not been furnished by the claimant, the failure of an ALJ to ask further questions, request additional records, or contact treating sources amounts to neglect of the ALJ's duty to develop the record. *Cook,* 783 F.2d at 1173. Moreover, if the information needed to make a determination is not readily available from treating source records, and a clarification cannot be

obtained, the ALJ is obligated to obtain a consultative examination. 20 C.F.R. § 416.912(f).  The Social Security regulations require the record to be sufficiently complete to allow the ALJ to determine the nature, severity, and duration of the impairments and the claimant's residual functional capacity to do work-related physical and mental activities. 20 C.F.R. § 416.913(e). "Because of the Commissioner's duty to develop the medical record fully and fairly, 'it is reversible error for an ALJ not to order a consultative examination when such evaluation is necessary for him to make an informed decision.'" *Pelt v. Barnhart,* 355 F. Supp.2d 1288, 1290-91 (N.D. Ala. 2005), *quoting Holladay v. Bowen,* 848 F.2d 1206, 1209 (11th Cir. 1988).

Although the ALJ found Claimant's DJD of the right knee to be a severe impairment that prevented him from engaging in his prior relevant work, the ALJ lacked sufficient evidence regarding the functional impact of Claimant's DJD on his ability to perform basic work activities. Instead of taking the step mandated by the Appeals Council and obtaining an updated physical examination and RFC assessment, the ALJ merely reprocessed the old data in an effort to superficially address some of the weaknesses in his prior decision that were identified by the Appeals Council. In the end, that approach resulted in a decision that was not supported by substantial evidence. The Court has no way of knowing whether the supplemental records, consultative examination, and medical source statement of Claimant's capabilities and restrictions would have changed the ALJ's decision. However, the Court concludes that this evidence, had it been obtained, reasonably may have led to a different decision. Accordingly, Claimant was prejudiced by the ALJ's failure to develop the record as instructed by the Appeals Council and in

keeping with the Social Security regulations. Thus, the Commissioner's decision denying Claimant's SSI application should be reversed and remanded for further proceedings in keeping with this opinion.

## VIII. <u>Conclusion</u>

After a careful consideration of the evidence of record, the Court finds that the Commissioner's decision denying Claimant's DIB application **IS** supported by substantial evidence, but the Commissioner's decision denying Claimant's SSI application **IS NOT** supported by substantial evidence. Therefore, by Judgment Order entered this day, the final decision of the Commissioner is **AFFIRMED, in part, and REVERSED, in part,** and this matter is **REMANDED** for further proceedings on Claimant's application for SSI pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of this Court is directed to transmit copies of this Order to all counsel of record.

**ENTERED:** November 23, 2011.

Cheryl A. Eifert
United States Magistrate Judge